IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:20-CR-13 |
| v. | The Hon. Liam O'Grady |
| JEREMY BRUCE JONES, a.k.a. "Wacko," | Sentencing: September 29, 2020 |
| *Defendant*. | |

## GOVERNMENT'S POSITION ON SENTENCING

The defendant, Jeremy Jones, comes before the Court for sentencing after pleading guilty to his role as the end of the supply chain in a sprawling and deadly heroin and fentanyl distribution network. The drugs that the defendant and his co-conspirators distributed directly contributed to the fatal overdose of a young woman who had previously served as a witness against another criminal defendant prosecuted in this District.

The United States agrees that the defendant's offense level is correctly calculated in the Presentence Investigation Report (PSR) (ECF No. 42), but objects to the Probation Officer's newly revised calculation of the defendant's criminal history. The defendant should be assessed with a total of four criminal history points, resulting in a criminal history category of III.

For the reasons provided herein—specifically, the gravity of the defendant's offenses, including his distribution of heroin that contributed to a fatal overdose, his prior criminal conduct, and because he committed the instant offenses while under court supervision—the government submits that a sentence of 180 months' imprisonment, above the applicable guidelines range, is appropriate and accordingly, asks the Court to impose such a sentence.

## BACKGROUND

On March 15, 2019, law enforcement responded to a call about a possible drug overdose at an apartment in Lake Ridge, Virginia. The victim was 25-year-old Brianna Beatty. Beatty's boyfriend, Joshua Embrey, who resided at the apartment with Beatty, had awoken to find her unresponsive, and called law enforcement. Prince William County detectives found Beatty deceased at the residence. Law enforcement searched the residence and found Beatty's cell phone, as well as a small plastic bag containing a powdered substance, a folded paper containing a powdered substance, and two straws in close proximity.

Embrey advised law enforcement that Beatty was a heroin addict and had recently come back from a substance abuse treatment program in California. Embrey knew that Beatty owed money for drugs to the defendant, and he knew that the defendant had previously provided drugs to Beatty that caused her to overdose. During the interview, Embrey provided the passcode to Beatty's cell phone and gave written consent to search the device.

In a subsequent interview, Embrey stated that Beatty had previously overdosed in approximately the first or second week of January 2019. He administered Narcan to Beatty and drove her to a firehouse, where paramedics took her to the hospital. Beatty told Embrey that, on that occasion, she had taken heroin and she had gotten it from the defendant. Beatty also told Embrey that the defendant had "fronted" her the drugs, and she owed him $40 dollars for the heroin and $20 as a fee for the front.

After Beatty's overdose in January 2019, she was sent to jail for violating her probation and when released, went to the rehabilitation clinic in California for a period of 30 days. Upon her release from rehab, Embrey picked Beatty up from Dulles International Airport on Sunday,

March 10, 2019. Soon after she arrived home, Beatty had again discussed the $60 she owed to the defendant and that she needed to pay him back.

On March 14, 2019, Embrey arrived home at approximately 6:45 PM. That night, Embrey explained, Beatty was acting normally. Later in the evening, he took their dog outside while she remained inside. When he came back from letting the dog out, Beatty was in the bedroom, standing beside the bed, bent over with her head on the bed. Embrey asked if she was okay and Beatty responded that she felt dizzy. Embrey helped Beatty into bed, where she went to sleep. When he checked on her at 10:30 PM, she gave an affirmative grunt, but did not move. When Embrey woke up the next day, he noticed Beatty had not moved after he had started to get ready for the day. Embrey stated that he then checked on Beatty and found her unresponsive and stiff. Embrey called 911 at approximately 8:51 AM, and the operator instructed Embrey to take Beatty to a hard surface. Embrey carried Beatty to the living room floor. When paramedics arrived, they pronounced her dead on arrival.

*Forensic Evidence of Beatty's Overdose*

As noted above, law enforcement seized a small plastic bag and a folded paper containing a powdered substance from the top of the dresser of Beatty's bedroom. This evidence was submitted to the DEA Mid-Atlantic Laboratory for testing. The powder in the baggie and in the folded paper were determined to be heroin mixed with caffeine and acetaminophen.

Dr. Kevin Schneider, Forensic Toxicologist, Virginia Department of Forensic Science, analyzed samples of Beatty's vena cava blood. The analysis of the vena cava blood test showed the presence of a variety of prescription medications, as well as morphine and 6-acetylmorphine, the primary metabolites in heroin.

Dr. Carmen Coles, Office of the Chief Medical Examiner, was the forensic pathologist who performed the autopsy on Beatty.  She ruled that Beatty died of accidental mixed drug (Heroin, Codeine, Alprazolam, Oxazepam, and Diphenhydramine) Intoxication.  Dr. Coles explained that Beatty had certain medications in her system consistent with her prescriptions.  These medications were found in her vena cava blood, along with the heroin metabolites.  Dr. Coles stated that the level of morphine (a metabolite of heroin) was consistent with a fatal level if Beatty had not used heroin recently, which was the case because Beatty had recently returned from rehab in California.

*Facebook Messages Between Beatty and the Defendant*

A search of Beatty's cell phone revealed Facebook messages between the defendant and Beatty documenting at least two narcotics transactions.

>JONES: U said u was gonna give me an extra 20 for the front right?
>
>JONES: I'm just trying to calculated everything im gonna have tomorrow bcuz I'm gonna reup sooner than I thought
>
>Brianna Beatty: Yeah so 60

On January 12, 2019, the defendant and Beatty discussed her overdose from the drugs she purchased from him on January 11, 2019.

>JONES: R u up
>
>Brianna Beatty: I got sick
>
>JONES: huh
>
>JONES: wat you mean
>
>Brianna Beatty: I'm in the hospital I overdosed
>
>Brianna Beatty: I'm stupid

4

This exchange on Facebook Messenger is consistent with what Embrey stated: Beatty had overdosed in the first or second week of January 2019, and she told Embrey the drugs were from the defendant.

On January 18 and January 20, 2019, the defendant messaged Beatty trying to collect on his money from the drugs he fronted to Beatty that had caused her to overdose.

> JONES: Can I get that bread now
>
> JONES: I'll be over that way Monday or Tuesday
>
> JONES: ???
>
> JONES: Wassup
>
> JONES: Don't have me show up ther and u don't got that money bri
>
> JONES: cuz u reading my messages n tryin play me

On January 31, 2019, the defendant and Beatty exchanged several messages where Beatty asked the defendant to front her a couple "points," which refers to a tenth of a gram of heroin or fentanyl. The defendant told Beatty that he also overdosed from the same drugs he sold to her.

> Brianna Beatty: I know your gonna say no but since I'm already paying you Monday, I'll definitely have 200 Monday, you could front me a little more, Just a couple pts and I'll give you the 200
>
> Brianna Beatty: pretty please
>
> JONES: I don't front ppl
>
> Brianna Beatty: but but but I already owe you so now I'l just give you more
>
> JONES: Hit me Wen u go the bread
>
> Brianna Beatty: Jeeeeereeemmmyyyy
>
>     **Later in Conversation**
>
> Brianna Beatty: Plllsss

5

> JONES: hit me Monday
>
> Brianna Beatty: Ughhhhh just a pointttt
>
> JONES: U can get more than a point Monday
>
> **Later in conversation**
>
> Brianna Beatty: I'm sorry. The overdosed fucked every thing up
>
> JONES: I feel u, I never told u this, but I overdosed that day too
>
> JONES: but still doesn't change that u messed my trust up
>
> JONES: so until u earn it back Bri, I can front u
>
> JONES: Trust is earned not given
>
> Brianna Beatty: Damn man that stuff was potent. And I know I'm sorry. I got you Monday.

On February 8, 2019, Beatty messaged the defendant that she was sent to jail for violating her probation and then was being sent away to California for rehab:

> JONES: Yo WTF is up
>
> JONES: Yo
>
> Brianna Beatty: I went to jail, now I'm going to rehab in Cali, I'm sorry dude I won't be back for like a month
>
> JONES: Man WTF
>
> JONES: wat u go to jail for
>
> Brianna Beatty: overdosing broke my probation

On the day before Beatty was found dead—March 14, 2019—at 9:57 AM, Beatty contacted an individual identified herein as A.H. via text message to set up an arrangement to exchange sex for money. Beatty and A.H. agreed to a price of $300 in exchange for sex. At approximately 1:40 PM, A.H. texted Beatty that he had parked outside and asked if he should come up, and Beatty responded "Yes."

6

Approximately 24 minutes after an exchange of messages relating to the arrival of A.H., on March 14, 2019, Beatty contacted the defendant via Facebook Messenger.

>Brianna Beatty: Yo
>
>(Facebook call between the defendant and BEATTY for 1 minute 36 seconds)
>
>Brianna Beatty: If you have it can I jus e Uber to you
>
>JONES: OK
>
>JONES: My Mans gonna drop it off to me
>
>JONES: R u gonna uber here then back out?
>
>JONES: Or should I have him just whip me to u
>
>Brianna Beatty: If you could whip to me that be great if you could whip to me that be great
>
>JONES: Ight, lemme tell em
>
>Brianna Beatty: Ur the best
>
>JONES: lol tru
>
>Brianna Beatty: Eta?
>
>JONES: I'm waiting for his reply now
>
>Brianna Beatty: Do you already have it already
>
>Brianna Beatty: I'll throw in and extra 40
>
>JONES: He picking shit up for me now, u caught me inbetween the reup
>
>Brianna Beatty: OK hopefully its fas[t] Because I can't let Josh [Embrey] know
>
>Brianna Beatty: Can you throw in a needle if he has one
>
>JONES: Nah don't Fuck wit stuff like needles, I got phobias of that shit

7

Later in the conversation on March 14, 2019, Beatty stated that she trusted the defendant and referenced the money she owed him. The defendant responded that he needed his supplier to hurry as well because he had other "plays"—other drug transactions—to make.

> Brianna Beatty: OK I'm trusting you plus I owe you money
>
> JONES: I know white gurl
>
> JONES: I need him to hurry too, bcuz I got other plays to make
>
> \*   \*   \*
>
> Brianna Beatty: Can I get $140
>
> JONES: Yes
>
> Brianna Beatty: OK and I got your 60 I/O you
>
> JONES: Bet

Eventually, Beatty and the defendant agreed that she would travel to the defendant's residence in order to complete the drug transaction, and the defendant provided his address.

> Brianna Beatty: Sooo?
>
> JONES: He hasn't hit triangle yet, I'm waiting to get picked up
>
> JONES: U might just have to come tome
>
> JONES: Can u get a ride?
>
> Brianna Beatty: Yeah what's the address I'll leave right now
>
> Brianna Beatty: ?
>
> (Facebook call between JONES and Beatty for 31 seconds)
>
> JONES: [defendant's address]

8

Later, in the conversation on March 14, 2019, Beatty indicated that she had arrived at the defendant's residence.

>Brianna Beatty: Here

>Brianna Beatty: Come outside

>JONES: behind u

>(Facebook call between JONES and BEATTY for 45 seconds)

*Subsequent Investigation*

Law enforcement subsequently identified an Uber driver who confirmed that he picked up Beatty on March 14, 2019, and dropped her off at the apartment complex where the defendant lived. The Uber driver stated that he watched as Beatty got out of the car and walked toward the building where the defendant's apartment was located.

Law enforcement also interviewed A.H., whom text messages showed was arranging with Beatty to meet to exchange sex for money. A.H. confirmed he had met with Beatty on March 14, 2019, and had paid Beatty $300 in exchange for sex. A.H. said he did not sell or provide any narcotics to Beatty and was not a drug user himself.

A review of the call detail records for Beatty's phone showed that on March 14, 2019, two calls were placed between Beatty's cell phone and a telephone belonging to the defendant's sister, Danielle. The investigation later revealed that Danielle had picked up the defendant and Beatty from his residence and driven them to another location to meet one of the defendant's heroin suppliers.

After law enforcement identified the defendant, the ensuing investigation identified a network of dealers extending from Woodbridge to the District of Columbia and Maryland. On

9

June 6, 2019, investigators conducting surveillance at a residence in Woodbridge associated with one of the defendant's associates observed a vehicle leave the residence and travel to the area around 1100 4th Street SW in the District of Columbia—the address of the D.C. Department of Consumer and Regulatory Affairs (DCRA). The driver of the vehicle met with an individual later identified as Darrell Pope, who was employed as a Plans Review Coordinator in the Permitting Center at DCRA. Law enforcement subsequently conducted a series of controlled purchases of what later tested positive for fentanyl from Pope. Pope and his supplier, Ronald Gorham, later pleaded guilty to conspiring to distribute 40 grams or more of fentanyl. *See* Case No. 1:19-CR-320 and No. 1:19-CR-355.

The defendant was arrested on state charges in Prince William County on March 22, 2019. Later, his state charges were nolle prossed to allow the federal case against him proceed. The defendant made his initial appearance in this District on October 7, 2020. PSR ¶ 1. On March 19, 2020, the defendant pleaded guilty to a two-count criminal information charging him with conspiracy to distribute fentanyl and 100 grams or more of heroin in violation of 21 U.S.C. § 841(a)(1) and 846, and distribution of heroin, in violation of 21 U.S.C. § 841(a)(1). PSR ¶ 4.

## SENTENCING ANALYSIS

**I.    Law**

The Court consults both the Sentencing Guidelines and the sentencing factors in 18 U.S.C. § 3553(a) to determine a defendant's appropriate sentence. Although the Sentencing Guidelines are advisory, district courts are required to "consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). Under the required procedures, a "district court shall first calculate (after making the appropriate findings of fact) the

range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

Section 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Paragraph 2 lists four purposes for a sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition to the purposes of sentencing listed in Section 3553(a)(2), a sentencing court must also consider: (1) the nature of the offense and the defendant's history and characteristics; (2) the kinds of sentences legally available; (3) the advisory sentencing range provided by the Sentencing Guidelines; (4) any relevant policy statement issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities; and (6) the need for restitution. 18 U.S.C. § 3553(a).

**II.   Guidelines Calculation**

In the initial PSR, ECF No. 40, the Probation Officer determined the defendant's base offense level to be 26, the adjusted offense level to be 23, and the criminal history to be category III, based in part on the defendant's conviction in Prince William County for Distribution of Schedule I/II Controlled Substances, and the fact that he was on probation for that offense when he committed the instant offenses of conviction. ECF No. 40, ¶¶ 55–57. The parties agreed to

the application of the two-point increase to the criminal history calculation under U.S.S.G.§ 4A1.1(d) in the plea agreement. PSR ¶ 5(a)(iii).

In the revised PSR (ECF No. 42), the Probation Officer has declined to count the prior conviction toward the defendant's criminal history, and has declined to apply the two-point increase to the criminal history calculation. The government submits that this is incorrect. The defendant was on probation for his prior drug conviction on March 14, 2019, when he distributed heroin that contributed to the overdose death of Brianna Beatty. The prior conviction and the fact that he was on probation for it when he committed the instant offense should all count toward his criminal history category, which the Probation Officer correctly calculated as III in the initial PSR (ECF No. 40).

The government concurs with the Probation Officer's application of the two-level reduction for acceptance of responsibility under § 3E1.1(a), and in accordance with the plea agreement, hereby moves for the additional one-point reduction under § 3E1.1(b). A total offense level of 23 and criminal history category III would yield an advisory Guidelines range of 57–71 months; however, the defendant's guidelines range is restricted by the statutory mandatory minimum of 60 months as to Count 1 of the Criminal Information.

### a. Section 3553(a) Analysis

After calculating the appropriate advisory guidelines range, the Court must "determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Green*, 436 F.3d 449, 456 (4th Cir. 2006). Here, the § 3553(a) factors dictate a sentence above the guidelines.

The defendant's offenses are grave. For years, he was involved in a heroin and fentanyl trafficking ring that contributed to at least one fatal overdose, and potentially other non-fatal ones. He knew the drugs he was distributing were dangerous because he, too, overdosed on them. PSR ¶ 24. And, of course, he committed the instant offenses while on probation for a state fentanyl distribution-related conviction, after he had violated his probation for submitting urine screens that tested positive for controlled substances. PSR ¶ 55.

The dangerous drugs the defendant sold have devastated communities throughout the United States. In Virginia in 2014, there were 241 deaths attributed to heroin and 134 deaths attributed to fentanyl. Va. Dept. of Health, Fatal Drug Overdose Quarterly Report 1st Quarter 2020, *available at* https://www.vdh.virginia.gov/content/uploads/sites/18/2020/08/Quarterly-Drug-Death-Report-FINAL-Q1-2020.pdf. By 2017, the number of deaths had jumped up to 558 for heroin and 770 for fentanyl. *Id.* In 2018, the number of heroin overdose deaths held steady at 556, but the number of fentanyl overdose deaths rose to 813. *Id.* In 2019, heroin deaths again remained steady at 556, and fentanyl deaths again rose to 964. *Id.* A sentence of 180 months is warranted to send a message to general deterrence to those who would get involved in dealing deadly drugs that result in the deaths of people suffering from addiction.

As in all cases, the United States is mindful of the need to avoid unwarranted sentencing disparities between related defendants. Ronald Gorham, a DC-based fentanyl supplier connected to the conspiracy, was sentenced to a term of imprisonment of only 66 months. *See* Case No. 1:19-CR-320. It is appropriate to take Gorham's sentence into account when determining this defendant's punishment. But the government lacked evidence to connect Gorham directly to

13

Beatty's overdose, whereas the evidence here clearly shows (and the defendant has agreed) that this defendant distributed the heroin that contributed to Beatty's death.

Further, a sentence of 180 months is not out of line with—and in fact, is significantly more lenient than—sentences imposed in other drug overdose cases, including the following:

1. *United States v. Joseph Riley Curry*, 1:18-CR-396 (AJT), sentenced to 252 months' imprisonment.

2. *United States v. John Jacob Stapleton*, 1:19-CR-340 (AJT), sentenced to 240 months' imprisonment.

3. *United States v. George Addae*, 1:19-CR-188 (AJT), sentenced to 240 months' imprisonment.

4. *United States v. Antowan Thorne*, 1:14-CR-165 (LMB), sentenced to 300 months' imprisonment.

5. *United States v. Christopher Louis Sorensen*, 1:18-CR-237 (TSE), sentenced to 262 months' imprisonment.[1]

There are certainly distinguishing facts about this case that make it appropriate to recommend a sentence of 180 months, which is less than the sentences described above. First, the defendant did not receive an enhancement for being a leader of the conspiracy, as in the case of George Addae. Second, the victim died of a mixed drug overdose, indicating that there may have been other factors that made her more vulnerable to overdosing on the drugs the defendant sold to her. Finally, there was no indication that the defendant ever possessed and firearms or was violent. Thus, the government has deemed it appropriate to recommend a sentence below the 20-year range that was appropriate in the above-listed cases.

---

[1] Of note, Brianna Beatty was a witness against Mr. Sorensen. She non-fatally overdosed on drugs she obtained from him before she began buying drugs from the defendant.

14

Nevertheless, it is important to remember that this investigation began because a young woman died, at least in part because of the drugs that the defendant sold to her. For a number of years, the defendant posed a significant danger to his community, and the Beatty family suffered the consequences. A sentence of 180 months' imprisonment is appropriate.

## CONCLUSION

For the reasons stated herein, the United States submits that a sentence of imprisonment of 180 months is sufficient but not greater than necessary to satisfy the sentencing factors in Section 3553(a).

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:     /s/
Katherine E. Rumbaugh
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2020, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send electronic notification of such filing to counsel of record in this case; and I will further forward an electronic copy to the United States Probation Officer assigned to the case.

/s/
Katherine E. Rumbaugh
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299-3982
katherine.rumbaugh@usdoj.gov