IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 1:20-CR-13 |
| v. | The Hon. Liam O'Grady |
| JEREMY BRUCE JONES, a.k.a. "Wacko," | Sentencing: December 1, 2020 |
| *Defendant*. | |

**RESPONSE OF THE UNITED STATES
TO DEFENDANT'S SUPPLEMENTAL POSITION ON SENTENCING**

In tort law, there is a concept known as the "eggshell plaintiff"—that is, a plaintiff who is particularly vulnerable or susceptible to injury because of some pre-existing or underlying condition. The "eggshell plaintiff" may nevertheless collect compensatory damages in the full amount of her injuries, despite the fact that the extent of her injuries was not reasonably foreseeable to the defendant. *See, e.g., Bradner v. Mitchell*, 362 S.E.2d 718, 722 (Va. 1987) ("It is axiomatic that a defendant who causes injuries to a plaintiff with a preexisting condition must take the plaintiff as he finds him.").

While this doctrine does not extend outside of common law torts, it is nonetheless instructive in this case because it illustrates the particular vulnerability of the victim, Brianna Beatty. Like many people suffering from drug addiction, Beatty clearly also suffered from underlying issues—in particular, mental health issues associated with the loss of a child—that her doctors were working to treat. She was prescribed medication, including alprazolam (Xanax), which unquestionably made her more susceptible to overdosing on heroin. But even if, as the

defendant posits, the heroin worked synergistically with the medication that Beatty was taking, that does not change the fact that the heroin that the defendant distributed to Beatty was "the straw that broke the camel's back." *Burrage v. United States*, 571 U.S. 204, 211 (2014). That is sufficient, as a matter of law, to find that the heroin the defendant distributed caused Beatty's death, which could have subjected the defendant to a 20-year mandatory minimum sentence. The government nevertheless allowed the defendant to plead to a lesser charge while admitting to the underlying facts of the distribution. But as in the case of the eggshell plaintiff, it is appropriate to hold the defendant accountable for Beatty's death, even though he had no reason to think it would result. For the reasons set forth in the government's position on sentencing, (ECF No. 44), as well as the reasons set forth below, a sentence of 180 months' imprisonment is appropriate in this case.

## I. That the defendant's expert disagrees with Beatty's treatment plan is irrelevant to Beatty's cause of death.

The defendant's expert, Dr. Katherine Boyle, posits eight conclusions regarding Beatty's cause of death. ECF No. 51-1 at 4–5. The first opinion faults Safe Harbor Treatment Center—the in-patient rehabilitation facility where Beatty stayed for 30 days shortly before her death—for failure to treat her opioid use disorder by implementing a Medication Assisted Treatment (MAT) protocol. *Id.* at 4.

Safe Harbor is a reputable treatment center in Costa Mesa, California, and it employs a range of experts who specialize in the treatment of addicted persons, and in addressing the underlying issues that contribute to substance abuse. Safe Harbor does utilize MAT as an intervention when clinical professionals find it appropriate. Reasonable minds can differ, however, as to the value and efficacy of MAT in different patients. In this case, Safe Harbor's

clinicians evidently ascertained that it was not appropriate for Beatty, and pursued other recognized forms of treatment.

Likewise, in her seventh opinion, Dr. Boyle faults Beatty's medical providers for not having her on a "stable medication regimen" prior to her death. ECF No. 51-1 at 5. This too pertains only to Dr. Boyle's assessment of Beatty's healthcare providers, and is a red herring with respect to the cause of her death. And, of course, Dr. Boyle does not state—nor could she credibly claim—that the medication that Beatty was prescribed was sufficient to cause her death alone.

In any event, the fact that Safe Harbor or Beatty's medical providers did not provide the type of treatment to Beatty that Dr. Boyle thinks best is in no way related to her cause of death. In every overdose case, the victim is a drug user. In every overdose case, some safety net to prevent the victim from abusing drugs has failed. It is no different here, and it does not change the fact that Beatty ultimately died from ingesting heroin she obtained from the defendant.

**II.     Brianna Beatty was not abusing her medication.**

As a corollary to her conclusions about Beatty's treatment providers, Dr. Boyle also concludes that Beatty was abusing her medication prior to her death. ECF No. 51-1 at 4–5. Dr. Boyle, however, ignores the fact that none of the medications found in Beatty's blood were present at levels sufficient to contribute to her death. Decl. of Kevin Schneider, Ph.D. ("Schneider Decl.") ¶¶ 15–20. So, even if Beatty were abusing her prescription medication, it is ultimately of no consequence, because it did not cause her death—it simply made her more vulnerable to a deadly overdose on heroin.

The evidence in this case, however, shows that Beatty was not abusing her prescription medication. For example, Beatty was prescribed alprazolam (Xanax) on March 12, 2019, two

days before she overdosed. At the scene, law enforcement recovered the bottle and found that it contained 13.5 2-mg alprazolam tablets. Dr. Boyle assumes that Beatty was prescribed 30 tablets, and therefore opines that Beatty took 16.5 tablets of 2-mg alprazolam tablets in just two days. ECF No. 51-1 at 5. That is incorrect.

To the contrary, photos of the recovered prescription bottle—which were provided to the defense via email on February 11, 2020—show that the prescription was for *only 23 tablets* of alprazolam, not 30 tablets, as Dr. Boyle wrongly states. The instructions are to take one tablet every six to eight hours as needed, which translates to three to four tablets per day.

 

Thus, Beatty was not missing 16.5 tablets; she was only missing 9.5 tablets.

4

As an initial matter, it is highly unusual for a drug addict who is abusing pills to take the time to break a pill in half and only take half of a dose. That alone suggests that Beatty was not abusing her alprazolam. Moreover, assuming Beatty took alprazolam for approximately three days—March 12, March 13, and March 14—she averaged just over three tablets per day. Thus, it is clear that Beatty was taking her alprazolam as directed, which explains why the level of alprazolam in her blood was within therapeutic levels. Schneider Decl. ¶ 16. Dr. Boyle is plainly wrong to suggest that Beatty was abusing her alprazolam, or that it in any way diminishes the defendant's culpability.

Likewise, Dr. Boyle is wrong to suggest that Beatty's consumption of oxazepam or clonazepam—two other benzodiazepines—diminishes the impact of the heroin that the defendant distributed in causing Beatty's death. With regard to the oxazepam, for which Beatty had a valid prescription, the levels in her blood were within a therapeutic level. Schneider Decl. ¶ 17. With regard to the clonazepam—there was no actual clonazepam in Beatty's blood, only a metabolite of clonazepam. That indicates that she may have ingested clonazepam sometime in the days prior to her death, but again, the level of the metabolite in no way indicates that it had any meaningful impact on her toxicology. *Id.* ¶ 18.

Dr. Boyle states, "[s]ometimes, opioid-abusing individuals, when unable to procure opioids, may also ingest benzodiazepines, such as alprazolam, clonazepam, and oxazepam, to blunt the effects of opioid withdrawal." ECF No. 51-1 at 4. True enough. But that statement is utterly irrelevant here when, as discussed above, the evidence shows that Beatty was *not* abusing her medication, and in any event, the levels of prescription controlled substances in her blood were

5

well within therapeutic levels. This assertion does nothing to blunt the fact that the heroin the defendant distributed was, again, the lethal catalyst for Beatty's death.

### III. Dr. Boyle wrongly concludes that Beatty abused codeine prior to her death.

Dr. Boyle's third opinion is that Beatty abused codeine, for which she did not have a prescription, prior to consuming heroin. Dr. Boyle correctly notes that the forensic analysis of the heroin found at the scene did not detect the presence of codeine. What is also notable is the fact that there is no indication that Beatty was ever prescribed codeine, nor was there any codeine found at the scene of her overdose, nor is there any evidence whatsoever that she obtained codeine from any illicit source in the time between when she arrived home from rehab in California (March 10) to when she died (the night of March 14).

What there is, however, is a simple explanation: the codeine likely came from an impurity in the heroin itself. As Dr. Schneider explains, heroin is derived from the opium poppy plant. Schneider Decl. ¶ 22. Opium naturally contains a small amount of codeine, and when opium is processed and then chemically converted into heroin (the scientific name for which is diacetylmorphine), the chemical reaction turns the small amount of codeine into acetylcodeine. *Id.* ¶¶ 23–24. When ingested by a user, heroin (diacetylmorphine) metabolizes first into 6-acetylmorphine and then morphine. If the heroin contains a small impurity of acetylcodeine, the acetylcodeine metabolizes into codeine, and eventually into morphine. *Id.* ¶ 25.

That chemical process is consistent with the result of the toxicology analysis on Beatty's blood. The level of codeine in Beatty's blood ($0.011 \pm 0.002$ mg/L)—which is significantly lower than the level of morphine ($0.16 \pm 0.04$ mg/L)—is consistent with her having ingested heroin that contained a small impurity of acetylcodeine. Schneider Decl. ¶ 26. This would also explain why

6

there was no evidence of Beatty obtaining codeine from anyone or anywhere else. Moreover, it is possible that the impurity in the heroin was such that the testing done on the heroin found at the scene was unable to detect it. *Id.* ¶ 27. In sum, it is inappropriate for Dr. Boyle to conclude definitively that Beatty had obtained illicit codeine and was abusing it.

### IV. The levels of morphine and 6-acetylmorphine in Beatty's blood indicate that she died from ingesting the heroin the defendant distributed.

Dr. Boyle states that "Ms. Beatty may have died from the synergistic effects of" the other substances found in her system "despite using a dose of heroin that may not have been fatal otherwise." ECF No. 51-1 at 5. That is absurd. Not only does this conclusion ignore the very relevant fact that none of the other substances were present in levels above what is considered therapeutic (*see* Schneider Decl. ¶¶ 15–20), it also completely disregards the significant level of morphine present in Beatty's blood.

The level of morphine found in Beatty's blood would be a potentially fatal level for anyone. Schneider Decl. ¶ 13. There is no dispute, however, that Beatty was incarcerated for a week, and then was sent directly to Safe Harbor Treatment Center for 30 days of in-patient rehabilitation. She would have had no access to opioids for that period, and as a result, her tolerance would have diminished. *Id.* Thus, it is even more likely that the level of morphine found in Beatty's blood constituted a fatal dose. Once again, the fact of her unusual vulnerability does not change the fact that the defendant's heroin caused her death, it only magnifies it.

Another important aspect of Beatty's toxicology that Dr. Boyle overlooks is the level of 6-acetylmorphine present in Beatty's blood. As explained above, heroin metabolizes in the body first as 6-acetylmorphine, and then very rapidly into morphine. *See* Schneider Decl. ¶¶ 7, 25. Had there been an extended period of time between Beatty ingesting heroin and her death, there

7

would be a much lower level of 6-acetylmorphine—if any at all—in her blood. *Id.* ¶ 14. Instead, the presence of 6-acetylmorphine in her blood at a level of 0.012 ± 0.003 mg/L indicates that she died so quickly after ingesting the heroin, that her body did not have time to break down all the 6-acetylmorphine into morphine. This is yet another indication that the heroin that the defendant distributed to Beatty tipped the scale toward a lethal overdose.

## CONCLUSION

It does not matter whether Safe Harbor should have loaded Beatty up with suboxone to curb her opioid cravings. It does not matter whether Beatty's doctor should not have prescribed her benzodiazepines. It does not matter that Beatty was taking a host of prescription medications. It does not matter that the prescription drugs in her system made her more susceptible to overdose. She—like so many other substance abusers—was vulnerable, and the defendant sold her what turned out to be, for her, a lethal dose of heroin. The harm would not have occurred in the absence of the defendant's conduct. *Burrage v. United States*, 571 U.S. 204, 211 (2014). A sentence of 180 months is appropriate to reflect the causal link because the defendant's conduct and the death of Brianna Beatty.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: _____/s/_____
Katherine E. Rumbaugh
Assistant United States Attorney

8

**CERTIFICATE OF SERVICE**

I hereby certify that on November 17, 2020, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send electronic notification of such filing to counsel of record in this case; and I will further forward an electronic copy to the United States Probation Officer assigned to the case.

/s/
Katherine E. Rumbaugh
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3700
Fax: (703) 299-3982
katherine.rumbaugh@usdoj.gov